OPINION OF THE COURT
Thomas R. Jones, J.
The defendant, Harry Lawrence, has appealed from a judgment convicting him, after a nonjury trial, of the crime of sexual abuse in the third degree, a class B misdemeanor (Penal Law, § 130.55), and a sentence of one-year probation, on the ground that his conviction was based upon evidence that did not establish his guilt beyond a reasonable doubt (US Const, 14th Arndt; NY Const, art I, § 6).
Except for the testimony of the complainant, Rosia Cruz, that she was sexually molested by the accused on a busy New York subway train, no corroborative evidence was *1028 presented to prove that the defendant committed any act of sexual abuse on the person of the alleged victim. This “pure” identification case, i.e., one in which there was no corroboration of the crime or the defendant’s connection with it, highlights the great dangers of misidentification of innocent persons which have haunted criminal justice from ancient times to the present. Apart from the alleged victim’s account of her experience on the subway train, no independent evidence was introduced which connected the accused with the crime; no proof was presented that confirmed, in any material particular, not only the evidence that the crime was committed but also that the defendant committed it. A careful examination of all of the evidence in the case, including the unchallenged testimony of the defendant’s good character given by one witness, and the exculpatory testimony of another, compels the conclusion that the guilt of the defendant was not established beyond a reasonable doubt.
A young Hispanic woman, the sole eyewitness in this case, testified that as she boarded a busy “GG” subway train at Broadway, Brooklyn, on the afternoon of October 17,1979, she suddenly felt a hand between her legs, thrust from behind, that touched her vagina. The complainant, Rosia Cruz, was wearing a nurse’s uniform and pants or slacks, and an overcoat that reached her knees. On feeling the strange hand between her buttocks, the victim claimed that she “tensed up and yelled.” When she looked back, Rosia Cruz said that she observed a man, whom she later identified as the person who touched her, “run away” to the adjoining car of the same train. Mrs. Cruz apparently did not observe the man’s face when she turned around. The complainant testified that she kept the man “who ran away” under constant observation as the train traveled from Broadway to the next station, Metropolitan Avenue. When the train stopped at Metropolitan Avenue, Mrs. Cruz said that she ran to meet her husband on the platform, by appointment, and informed him about the incident. Together they went in search of a policeman. They found a transit officer near a change booth on the upper level of the station. During this interval, as Mrs. Cruz talked with her husband and later with the transit policeman, she claimed *1029 that she continued to observe the movements of the defendant as he walked toward another platform of the Metropolitan Avenue station.
Transit Officer Benson testified that Mrs. Cruz described her assailant to him, as a man who “appeared to be black”, who was “short and heavy” and wore a “short Afro” and a “trench coat.” Mrs. Cruz did not otherwise identify the features or figure of the person who touched her, even though she testified that she kept him constantly in view as the train traveled from one station to another. Officer Benson walked with Mrs. Cruz to another area of the platform in search of the alleged culprit. According to Benson, Mrs. Cruz pointed to the defendant when they reached the “LL” platform. Harry Lawrence, the person she designated, was then standing a short distance away, apparently waiting to board a Manhattan-bound “LL” train which had arrived. Benson entered the train after Lawrence, whom he found seated. He detained Lawrence and ordered him to leave the train. The defendant complied. Benson then asked Mrs. Cruz whether the person he had detained “was the man” and she replied in the affirmative; Harry Lawrence was then arrested.
The defendant, a 22-year-old black man, testified that on December 17, 1979, he had been employed as a security guard at a construction site on 12th Street, Manhattan. He said that when arrested he was going to work, as usual, via the “LL” train at Metropolitan Avenue station. Lawrence acknowledged that he boarded the “GG” train at the Broadway station, with a friend, Oliver Taylor, and said that they traveled together to Metropolitan Avenue. At that point he changed platforms for a train that would take him to the area of Manhattan where he worked. When arrested, Lawrence was wearing a trench coat and boots. He was carrying a drawstring bag which contained his security guard uniform, a hat and other paraphernalia. A nightstick, which the accused said he used on his job, protruded from the top of the bag. Lawrence denied that he had ever seen or touched the complainant at the Broadway station.
Oliver Taylor, called as a witness by the defense, testified that on October 17, 1979, shortly before the defen *1030 dant’s arrest at 3:00 p.m., he had repaired a TV set for defendant’s mother, and then accompanied Lawrence to the Broadway station. Together they boarded a “GG” train bound for Metropolitan Avenue. Taylor said that he and Lawrence remained in each other’s company until the train reached the Metropolitan station. At that point, Lawrence proceeded alone toward the “LL” platform to catch a Manhattan-bound train. If Taylor’s testimony is credited, it virtually excluded the possibility that the defendant, Lawrence, touched Rosia Cruz and caused her to cry out or “yell,” as she claimed, at the Broadway station.
John Edward Shelton, a security guard for United Airlines, testified that he had been a New York City Policeman for 20 years. Shelton said that for 12 years he had been on friendly terms with Harry Lawrence and his family, and that he knew the defendant well enough to vouch for his excellent reputation for truthfulness and veracity. If accepted, this character evidence would raise a reasonable doubt when considered with all the other evidence in the case (cf. People v Trimarchi, 231 NY 263; People v Colantone, 243 NY 134, 136).
Shelton’s good character testimony is circumstantial evidence which bears on the probability that the defendant did not commit the act charged against him, with the required guilty intent, or at all, and warranted his acquittal because it created a reasonable doubt of guilt (cf. Commonwealth v Beal, 314 Mass 210). Credible character evidence may create a reasonable doubt even in the face of more positive or corroborative testimony than that presented in this case (cf. People v Colantone, supra; People v Miller, 35 NY2d 65; McCormick, Evidence [2d ed], § 191).
The law of New York does not require corroboration to prove the crime of sexual abuse in the third degree (Penal Law, § 130.55), i.e., “subjecting] another person to sexual contact without the latter’s consent” or implied acquiescence. Hence, a criminal information that accuses a person of “furtive buttock pinch” in a crowded subway train, or the most flagrant public sexual manipulation of an unwitting stranger may be proved by the testimony of the alleged victim alone.
*1031 This appeal presents a classic example of the grave danger that an innocent person, i.e., one whose guilt has not been established beyond a reasonable doubt, may be convicted on testimony of an alleged victim who states emphatically, “That’s the man.” The risk of a miscarriage of justice in sexual abuse prosecutions increases geometrically when no corroborative evidence is presented to prove that any crime was committed or to establish that the accused was materially connected with the offense or the victim. Judicial experience, dating back to early American history, and a large body of sound psychological research demonstrate the fallibility of human perception, especially during traumatic or excited incidents of short duration.[1] Notwithstanding the proven unreliability of eyewitness testimony, misidentification remains “perhaps the major cause for wrongful convictions.”[2]
A more serious threat to the rights of the people, of high or low degree, occurs in cases of “pure” identification,[3]
[4]i.e., when no corroborative evidence is presented to support the testimony of a single eyewitness who forcefully states that the accused person committed a criminal act upon her person, i.e., by snatching a purse, striking, touching, feeling or kissing the victim on a crowded subway train. In such fast-moving situations, justice requires that the Judge caution the jury concerning the physical and psychological limitations of the human perceptions.[4], [5] Judges *1032 must be mindful of the fact that scientific psychological research has established, beyond peradventure, that the capacity of human beings to comprehend, recall, and later accurately recount, their experiences, especially those incidents that have occurred under stressful conditions, is conditioned, in large measure, by the circumstances, excitement, proximity and the person’s acuity, as well as by the victim’s cultural and personal prejudices.[6] Time factors also influence the ability of human beings to perceive, reconstruct and later accurately describe traumatic experiences, particularly when they themselves have been physically accosted or threatened by a criminal, under circumstances of short duration.
On this appeal, as in many other eyewitness identification cases, the sole eyewitness offered, as positive knowledge, only her impression that she received during a few seconds of observation, after the event. Mrs. Cruz was shocked when she felt the hand between her legs, because she “tensed up and yelled.” On recovering her wits, and turning around, she said she saw a man who “ran away” to another car of the same train. The victim did not know that that man touched her. She did not see him move his hand or touch her when she turned around. The complainant *1033 merely surmised that the defendant, who had stood nearby and left hurriedly, was her assailant. A swift impression of any event must be gauged by the geographic proximity between the individuals involved, the length of time involved and the opportunity that the victim had to observe what was happening to her, as well as her surroundings on a busy train.[7], [8]
The lack of any evidence to corroborate the testimony of Mrs. Cruz that the defendant touched and felt her from behind, and fled; the unchallenged denials by the defendant that he had ever seen or touched the victim, combined with the exculpatory testimony and good character evidence offered on behalf of the accused, engenders a sense of unease and creates a reasonable doubt of the defendant’s guilt. As in People v Kidd (76 AD2d 665, 666), which involved a one-witness identification situation, assuming the evidence in this case is sufficient to make out a prima facie case, “(n)evertheless, we are left with a disturbing feeling of a grave risk that an innocent man has been convicted.” The well-known vagaries of visual identification, under emotional stress, have long been found to be “conceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished.”[9] The continuing rise in the number of documented cases of misidentification in criminal prosecutions requires that trial courts carefully scrutinize all “pure” eyewitness accusations.
Accordingly, the judgment of conviction is reversed, on the law, and the complaint is dismissed.
Pino, P. J., and Buschmann, J., concur.

. Professor E. Borchard’s analysis of the convictions of 65 innocent men, .in his study, Convicting the Innocent (1932), dramatizes the awful tragedies which abound in the criminal justice system as a result of misidentification of accused persons by “eyewitnesses” to crimes.

. See, e.g., Time, April 2, 1973, p 59 (report of mistaken identification of an Assistant District Attorney and a sanitation department chauffeur); see, also, Reynolds, Courtroom [1950]; Duke v State (260 Ind 638), in which a police officer positively identified two men sitting at the defense counsel table. The man identified was not the defendant charged with the crime, as later shown by fingerprints of the actual crime.

. See Sobel, Eye-Witness Identification, Legal and Practical Problems [1972].

. In United States v Telfaire (469 F2d 552), the Circuit Court urged that in a single eyewitness identification case, to minimize the danger of an unjust conviction, the Trial Judge should caution the jury to consider, inter alia:
The witness’ opportunity to observe the criminal acts and the person committing them, including the length of time available for observing; whether the witness had occasion to see or know the defendant before the incident; the distance between the various parties; the light or lack of light at the time; the witness’ state of mind at the time of the offense; and other circumstances affecting the witness’ opportunity to observe the person committing the offense.
*1032 The identification made by the witness after the offense must be the product of his own memory. The jury may take into consideration any subsequent identification, the circumstances surrounding the identification, the certainty or lack of certainty expressed by the witness, the state of mind of the witness at the time, and other circumstances bearing on the reliability of the identification. The jury may also consider the length of time that elapsed between the occurrence of the crime and the time the witness saw the defendant as a factor bearing on the reliability of the identification.

. Report to Secretary of State for Home Department of Departmental Committee on Evidence of Identification in Criminal Cases, written under the chairmanship of Lord Devlin (The Devlin Report) involved two Englishmen, Messrs. Dougherty and Virag, who were convicted on eyewitness testimony clearly demonstrated to have been mistaken. The British Parliament and the press took up the cases, causing a public outcry against a justice system that could countenance such plainly unacceptable results. The cases combined errors by the police, defense and prosecuting counsel, and the trial and appellate courts. The Eleventh Report on Evidence prepared by the committee and presented to Parliament by the Secretary of State for the Home Department on April 26, 1976, recommended that British Judges be required to give warning to juries of the danger of convicting innocent persons on the uncorroborative evidence of complainants in sex abuse cases.

. 2 Wigmore, Evidence (Chadboum rev, 1979), §§ 657, 658. Psychological research on human perception has advanced from nineteenth century recording machine analogy to a more complex understanding of selective decision-making processes. Buckhout, Guilt by Fabrication: Psychology and The Eyewitness, ch 17, in Siegel and Ziegler (editors), Psychological Research (1976); see, also, Fishman, Some Current Research Needs in the Psychology of Testimony, 13 J Soc Issues 60.67.

. Felix Frankfurter, later an Associate Justice of the United States Supreme Court, in his book: The Case of Sacco and Vanzetti (1927) exclaimed (p 30): “What is the worth of identification testimony even when uncontroverted. The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American Trials”.

. In his review of Elizabeth F. Loftus’ book, “Eyewitness Testimony” (81 Colum L Rev 441, 442), Jack B. Weinstein, Chief Judge, United States District Court, Eastern District of New York points out that: “Among the factors affecting accuracy [of an identification] are exposure time, detail salience —• that is to say the importance or interest of a detail to the observer —• and the observer’s stress. Some of this material may well be subject to judicial notice since it is so widely known.”

. McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm & Mary L Rev 235, 238.